UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| QUAVOTIS HARRIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 20 C 7602 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| TOM DART in his official capacity as Cook ) | |
| County Sheriff; COOK COUNTY; COOK ) | |
| COUNTY HEALTH AND HOSPITAL ) | |
| SYSTEM; CERMAK HEALTH SERVICES ) | |
| OF COOK COUNTY; LINDA ) | |
| FOLLENWEIDER; and JESUS ESTRADA, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Plaintiff Quavotis Harris, a detainee at the Cook County Jail who has a prosthetic right leg, filed this § 1983 civil rights action complaining that he has not received appropriate medical care related to his prosthesis. In his third amended complaint, Harris focuses on the scheduling of medical care and names as Defendants Tom Dart, in his official capacity as the Cook County Sheriff, Cook County (the "County"), Cook County Health and Hospital Systems ("CCHHS"), Cermak Health Services of Cook County ("Cermak"), and former and current Cermak Chief Operating Officers Linda Follenweider and Jesus Estrada. Harris requests both injunctive and monetary relief. Defendants have filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Although Harris has sufficiently alleged a *Monell* claim against Dart and the County, the Court dismisses his claims against Follenweider and Estrada because Harris has not sufficiently alleged their personal involvement in the alleged constitutional violations. The Court also dismisses CCHHS and Cermak as Defendants because they do not have a separate legal existence from the County.

## BACKGROUND[1]

Harris uses a prosthesis for his right leg after having that leg amputated above his knee in 2006. In July 2019, Harris moved from the Illinois Department of Corrections to the Cook County Jail. That month, Alison Schoen examined Harris and noted that his prosthesis was too tight, caused sores that required antibiotic treatment, and required Harris to use a cane. Harris told Schoen that he was supposed to receive an evaluation for a new prothesis. Schoen referred Harris for physical medicine and rehabilitation. A physician's assistant, Barbara Davis, also examined Harris in July 2019, noting that Harris had friction and fitting issues with his prosthesis. Another physician's assistant, Alina Colon, similarly noted that Harris' prosthesis did not fit right because the stump did not reach the bottom of the fitted part of the prosthesis. Harris told Colon that the fit issues caused him severe pain, particularly when the prosthesis bore weight. He reported that pain medications and anti-inflammatories did not alleviate the pain.

In August 2019, after seeing physician's assistant Glen Trammell and reporting continuing problems, Harris filed a grievance complaining that medical staff had failed to address the problems with his prosthesis. Susan Shebel responded that Harris had declined an assessment of his stump, a response Harris appealed because he had not declined any such care. In September 2019, Harris saw Jamie Crothers. Crothers apparently recorded that he offered to have the prosthesis' socket modified and Harris' residual limb reassessed, but that Harris refused

---

[1] The Court takes the facts in the background section from Harris' third amended complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Harris incorporated Defendants' September 27, 2022 interrogatory responses into his third amended complaint, and so the Court takes those into consideration. But the Court does not find it appropriate to consider the remaining exhibits the parties have submitted in connection with the motion to dismiss.

such care. In October 2019, Harris again saw Crothers, complaining of boils and other skin issues caused by the prosthesis. Crothers recommended that Harris stop using the prosthesis. In November 2019, Harris went to an outside clinic to adjust his prosthesis. Upon Harris' return to the Jail, Dr. Gregory Haman examined Harris and noted that Harris needed to use a cane when walking, often used a wheelchair, and rated his pain at a constant 7 of 10, with that pain increasing if he missed a medication dose.

In January 2020, Harris saw Dr. Izabela Biesiada, who again noted that Harris suffered from an ill-fitting prosthesis. Harris received an increased does of gabapentin to help reduce the pain and allow him to sleep. Dr. Haman also saw Harris that month, noting an erosion to Harris' proximal medial thigh and a fissure over the stump. In March 2020, Harris saw Trammell, who observed that the prosthesis' hydraulic knee leaked fluid and would eventually fail. Trammell indicated he would check on the cost of replacing or refurbishing the knee unit.

In March and June 2020, Harris filed grievances concerning the ongoing issues with his prosthesis. At this point, the prosthesis caused the bone in his residual limb to press against the base of the stump and threaten to puncture the skin. It also caused him pain in his left knee and spinal damage in his lower back because of severe misalignment that impacted his posture. The grievance responses merely indicated that his problems had already been addressed. In June 2020, Dr. McCarthy replaced Harris' knee unit and otherwise adjusted the prosthesis. Despite these adjustments, she noted that Harris continued to suffer from significant pain and the socket being too tight. Dr. McCarthy ordered x-rays, which revealed significant irregular heterotopic ossification at the femoral stump and heterotopic ossification within the posterior soft tissues of the mid-thigh. X-rays also revealed degeneration of Harris' spine.

In October 2020, Harris had additional x-rays taken of his knee. Crothers and physician's assistant Daniel Kaczrowski followed up in November 2020 to discuss the chronic knee pain Harris experienced due to his ill-fitting prosthesis. Dr. McCarthy saw Harris again in November 2020, noting significant heterotopic ossification at the femoral stump and within the posterior soft tissues of the mid-thigh. She cast a new socket for his prosthesis. Crothers next saw Harris in January 2021, when Harris told him he continued to experience pain due to incorrect socket sizing. In March 2021, Harris complained again of chronic left knee pain. Instead of correcting the prosthesis, Harris was told to continue his pain medication and use a wheelchair if necessary. In April 2021, nurse practitioner Elamma Chollampel saw Harris, who indicated she would refer him to an orthotics clinic. In June 2021, Harris against saw Dr. McCarthy and reported that the socket continued to fit improperly, causing him upper medial groin pain and a distal callous on his stump. Harris reported similar problems in August 2021. He saw Davis in October and November 2021, complaining of continuing severe pain, pressure sores, and compression of his gluteal muscles. In November 2021, Harris filed an emergency grievance concerning his prosthesis, but the appeal was denied. Harris saw Dr. McCarthy again in January 2022, complaining again that his prosthesis did not fit correctly.

Nurse Anderson told Harris that while she knew the lack of medical care he received for his prosthesis was wrong, she could not do anything if the Jail refused to spend the money to address the issues. Nurse James similarly told Harris that it was widely understood that his prosthesis was not fixed because the Jail did not want to pay the money to do so. And the Jail's ADA coordinator, Sabrina, also told Harris that it was too expensive to fix his prosthesis.

Follenweider served as the Chief Operating Officer for Cermak from November 2016 through June 2020, with Estrada taking over that role in August 2020. In this role, Follenweider

4

and Estrada had responsibility to ensure that Harris had scheduled and received his necessary medical care and that adequate funding existed for such medical care.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. *Monell* Claim against the County[2]

Although the County cannot be held liable under § 1983 based on *respondeat superior*, *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015), pursuant to *Monell*, a plaintiff can sue a municipality under § 1983 when the municipality's policy or practice was the "moving

---

[2] Harris also brings his *Monell* claim against CCHHS and Cermak. But, as Defendants point out, CCHHS and Cermak do not have a legal existence separate from the County and thus are not proper parties. *See Johnson v. Cook Cnty. Sheriff's Office*, No. 16 C 07523, 2018 WL 2193235, at *2 & n.1 (N.D. Ill. May 14, 2018) (CCHHS has no separate legal existence apart from the County, collecting cases); *Manney v. Monroe*, 151 F. Supp. 2d 976, 988 (N.D. Ill. 2001) ("Cermak is a department within Cook County, with no legal existence, and, therefore, is not a suable entity."). Harris acknowledges this but asks for leave to amend to clarify that he seeks to proceed against the County in its own name and for CCHHS' and Cermak's actions. The Court does not find amendment necessary to make this clear, particularly given that the County acknowledges that CCHHS and Cermak are subdivisions of the County.

force of the constitutional violation." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978). To state a *Monell* claim, Harris must allege (1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

Here, Harris contends that the County maintains a policy or practice of denying and delaying medical care to detainees, in part due to cost-cutting measures. The County argues that Harris has provided only conclusory allegations that do not suggest the required widespread pattern or practice, instead improperly relying solely on his own experience. *See Rossi*, 790 F.3d at 737 (a *Monell* claim requires "a *widespread practice* that permeates a critical mass of an institutional body," not "individual misconduct"); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." (citation omitted) (internal quotation marks omitted)).

But the County asks too much of Harris at the pleading stage, at which the Court need only determine whether Harris has sufficiently alleged his *Monell* claim under the dictates of *Iqbal* and *Twombly*. *See White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (federal courts do not apply a "heightened pleading standard" to *Monell* claims). Indeed, courts have recognized that *Monell* claims may proceed "even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged

wrongdoing." *Armour v. Country Club Hills*, No. 11 C 5029, 2014 WL 63850, at *6 (N.D. Ill. Jan. 8, 2014) (quoting *Riley v. Cnty. of Cook*, 682 F. Supp. 2d 856, 861 (N.D. Ill. 2010)). Further, Harris' "pleading burden should be commensurate with the amount of information available" to him before discovery, *Olson v. Champaign Cnty.*, 784 F.3d 1093, 1100 (7th Cir. 2015) (citation omitted), and here, Harris specifically alleges that Defendants have refused to provide him with information concerning the treatment of other detainees with prostheses.

That said, Harris has included sufficient factual allegations to put the County on notice of the alleged wrongdoing, tying his medical injuries to the County's alleged policy or practice of denying and delaying medical care to detainees, in part due to cost-cutting measures. Harris includes specific allegations of various County employees' indifference to his medical needs over a more than two year period of time. *See Haywood v. Wexford Health Sources*, No. 16-CV-3566, 2017 WL 3168996, at *3–4 (N.D. Ill. July 26, 2017) (allowing *Monell* claim to proceed where the plaintiff alleged that eleven different treaters repeatedly and consistently failed to respond to or treat his illness, collecting cases). Further, Harris alleges that two nurses and the Jail's ADA coordinator acknowledged that the County refused to spend the money needed to address the problems associated with his prosthesis, which also suggests that the County maintained a cost-cutting policy that prevented him from receiving needed medical care. *See Simmons v. Godinez*, No. 16 C 4501, 2017 WL 3568408, at *4 (N.D. Ill. Aug. 16, 2017) (collecting cases where plaintiffs alleged that cost-cutting measures resulted in plaintiffs receiving inadequate medical care, noting that in *Simmons*, Wexford employees told the plaintiff that they could not send him to see an outside doctor because of the cost). The fact that Harris does not include specific details of other detainees' experiences does not warrant dismissal, particularly because his allegations suggest widespread practices, not isolated events. *See*

*Williams v. City of Chicago*, No. 16-cv-8271, 2017 WL 3169065, at *8–9 (N.D. Ill. July 26, 2017) (noting that post-*White* courts analyzing *Monell* claims "have 'scotched motions to dismiss' premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff," collecting cases); *Barwicks v. Dart*, No. 14-cv-8791, 2016 WL 3418570, at *4 (N.D. Ill. June 22, 2016) (at summary judgment, a single incident cannot establish a *Monell* claim, but at the motion to dismiss stage, a plaintiff "need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists"). Discovery will uncover whether Harris can prove his *Monell* claim, but at the pleading stage, he has stated a plausible claim for relief. *See Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *4 (N.D. Ill. Mar. 2, 2018) ("[T]he City's arguments that Plaintiff's allegations do not 'establish' the existence of a widespread policy are misplaced because at this stage of the proceedings, the Court must determine whether Plaintiff has stated a plausible claim for relief, not that he has 'established' or 'proven' his claims.").

**II.** *Monell* **Claim against Dart**

Harris also seeks to hold Dart liable in his official capacity for injunctive relief only. But Dart argues that the County, not his office, has sole responsibility for detainee medical care, making him an improper defendant for Harris' *Monell* medical care claim. *See, e.g.*, *Harrison v. Cnty. of Cook*, No. 08 C 3202, 2011 WL 4036115, at *8 (N.D. Ill. Sept. 12, 2011) ("Cook County and the Cook County Sheriff's office are separate entities with distinct responsibilities. Cook County, through Cermak, is responsible for providing medical care to detainees. Dart's office, by contrast, is responsible for operating and maintaining the CCDOC as a jail."). "[T]he fact that someone else has primary responsibility for medical care does not mean that [Dart has] no responsibility for medical care," however. *Jones v. Barber*, No. 17-cv-07879, 2020 WL


1433811, at *5 (N.D. Ill. Mar. 24, 2020) (rejecting argument that a plaintiff cannot proceed against the Sheriff's Office on a *Monell* claim related to medical care at the Jail); *see also Daniel v. Cook Cnty.*, 833 F.3d 728, 737 (7th Cir. 2016) (rejecting the argument that the Sheriff's Office was not a proper defendant for a *Monell* medical care claim because "the constitutional duty under the Eighth and Fourteenth Amendments to provide adequate health care rests on the custodian"); *Parish v. Sheriff of Cook Cnty.*, No. 07 C 4369, 2019 WL 2297464, at *8 (N.D. Ill. May 30, 2019) ("The Sheriff's reliance on Cermak to provide medical care to detainees does not excuse him from liability under § 1983."). Therefore, at least at this stage, the Court allows Harris' *Monell* medical care claim to proceed against Dart in his role as Harris' custodian.[3]

### III. Individual Capacity Claims against Follenweider and Estrada

Next, Follenweider and Estrada argue that the Court should dismiss Harris' claims against them because they had no personal involvement in his medical care. A plaintiff cannot base a claim against a supervisory official on *respondeat superior* liability; instead, § 1983 requires the personal involvement of each defendant. *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014); *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). "[T]o be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted); *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) ("[A]n individual must be personally responsible for a constitutional deprivation in order to be liable, [but] personal responsibility is not limited to those who participate in the offending act."). Personal liability exists where the conduct occurred at the defendant's direction or with his or her knowledge and consent. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). In other words,

---

[3] Dart also argues that Harris has not sufficiently alleged Dart's personal involvement in the alleged constitutional violation. But Harris only seeks to proceed against Dart in his official capacity, not his individual capacity, and so the personal involvement requirement does not come into play.

the defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)).

Harris alleges that, in their roles as chief operating officers for Cermak, Follenweider and Estrada had responsibility for providing health services to patients at the Jail, which included the scheduling and delivery of Harris' medical care. Harris further alleges that they failed to ensure that Cermak had adequate policies and procedures in place to provide that medical care and failed to ensure that Cermak had adequate funding to provide detainees like Harris with required medical care. But these allegations do not suggest Follenweider or Estrada had any knowledge of Harris' particular circumstances or any involvement in Harris' medical care. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct.").

Harris argues, however, that Defendants cannot now contend that Follenweider and Estrada did not have responsibility for scheduling Harris' medical care after they identified Follenweider and Estrada as the individuals responsible for scheduling medical treatment and care in response to Harris' interrogatories. Although Defendants identified these individuals as "administratively responsible for providing health services to patients at the Cook County Jail," Doc. 83-3 at 2, this identification does not absolve Harris from connecting their administrative role at Cermak to his specific situation, something which he has not done here. *See Brown v. Dart*, No. 20-CV-4193, 2021 WL 4401492, at *6 (N.D. Ill. Sept. 25, 2021) (dismissing individual capacity claim against Dart where the plaintiff had "not plausibly alleged that Dart was aware of any of his particular conditions"). Because Harris' allegations do not allow for the inference that Follenweider or Estrada had the required personal involvement in allegedly

depriving Harris of his constitutional rights, the Court dismisses Harris' individual capacity claims against them.[4]

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss the third amended complaint [79]. The Court dismisses Harris' claims against Follenweider and Estrada without prejudice. The Court dismisses CCHHS and Cermak as Defendants with prejudice.

Dated: April 18, 2023

                                                    SARA L. ELLIS
                                                    United States District Judge

---

[4] Follenweider also argues that the statute of limitations bars Harris' claim against her, and both Follenweider and Estrada contend that qualified immunity protects them from liability. Because Harris has not adequately alleged Follenweider's or Estrada's personal involvement in the alleged constitutional violation, the Court need not reach these arguments.

11