**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| QUAVOTIS HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 7602 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| TOM DART in his official capacity as Cook | ) | |
| County Sheriff; COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff Quavotis Harris, a post-trial detainee at the Cook County Jail who has a

prosthetic right leg, filed this § 1983 civil rights action complaining that he has not received

appropriate medical care related to his prosthesis.  The Court dismissed several of his claims at

the pleading stage, Doc. 89, leaving him with a deliberate indifference claim against Defendants

Tom Dart, in his official capacity as the Cook County Sheriff, and Cook County (the "County").[1]

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Because Harris has not established a question of material fact as to whether Defendants

maintained a policy or practice of delaying or denying care to detained amputees, the Court

grants Defendants' motion.

---

[1] Because Harris is no longer detained, he has agreed to voluntarily dismiss his claim for injunctive relief
and so the Court does not discuss that claim further. *See* Doc. 199.

## BACKGROUND[2]

### I.      Harris' Experience

Harris was a post-trial detainee at the Cook County Department of Corrections ("CCDOC") from July 9, 2019 to February 15, 2026.  Harris has a prosthetic right leg and uses a cane due to a gunshot wound that he suffered in 2006.  Harris has had various prosthetic-related injuries, including irregular boney protrusions, significant irregular heterotopic ossifications on his femoral stump and mid-thigh, and groin impingement.  He also has chronic lower back pain, phantom limb pain, and patellofemoral pain syndrome in his left knee.

During his intake screening at CCDOC on July 9, 2019, Harris told CCDOC staff that his prosthesis was too tight and he needed an evaluation for a new prosthetic leg.  Harris complained that the socket did not fit, which caused him sores, pain, discomfort, and other problems.  Harris testified that he understood that the County would not fix his prosthesis for cost reasons. Specifically, Harris recalled Nurse Anderson telling him that "Cook County Jail would not spend the money necessary to fix his problems."  Doc. 184 ¶ 10.  Harris also testified that Sabrina Rivera-Cancholo, the Americans with Disabilities compliance officer for the Cook County Sheriff's Office, told him that a new prosthesis would cost too much.  Rivera-Cancholo testified that, while she met Harris in 2019 and spoke with him numerous times, she never brought up the cost of a prosthetic device with Harris or any other inmate during her career with the County.

On July 16, 2019, Physician Assistant ("PA") Barbara Davis saw Harris at Cermak Health Services ("Cermak").  Harris reported having friction and fitting issues with his prosthesis, including that it was too tall for him.  Harris had a small sore, and Davis scheduled Harris for a primary care appointment on July 30, 2019.  Before arriving at CCDOC, Harris took

---

[2] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts and the supporting exhibits.  The Court takes all facts in the light most favorable to Harris, the non-movant.

3200 mg of gabapentin daily for pain, but CCDOC only allotted him 2700 mg daily, so he requested that he receive a higher daily dose. On July 30, Harris saw PA Alina Colon, telling Colon that his prosthetic leg did not fit because his leg stub did not reach the bottom of the fitted part and rubbed in several places. Harris indicated that he used an eye patch to pad the area of friction and used urea and bacitracin on his leg stub wound. Colon instructed Harris to continue using the bacitracin and urea as needed and padding the area of friction with the eye patch. She also increased Harris' gabapentin to 3200 mg and scheduled him for a chronic care management appointment on August 15, 2019.

On August 3, 2019, Harris saw Nurse Taylor for a wound check, with Harris telling Taylor that he had a torn and tattered prosthetic sleeve. Harris received a pad to prevent the resultant pinching effect. Taylor also identified a wound in the area that had a raised, dry nodule. The following day, Nurse James conducted another wound check, again noting the raised, dry nodule, and gave Harris another pad. On August 13, Dr. Theresa McCarthy, the attending physician in the County's Department of Physical Medicine and Rehabilitation, saw and evaluated Harris. Harris understood from this appointment that he would be cast for a new prosthesis. On August 13, 14, and 17, Nurse Shiny James performed wound checks and found no drainage or new symptoms on Harris' stump, and Harris denied any complaints. On August 15, PA Glen Trammel saw Harris for his chronic care management appointment. Harris complained of phantom limb pain, and Trammel referred Harris to neurology, scheduling an appointment on October 31, 2019. On August 16, Nurse Anderson observed that Harris' wound was healing. On August 20, Nurse Ngonme found that Harris' stump had no swelling, redness, or bleeding. She cleaned the stump and applied gauze to prevent friction. On August 25, Nurse Jardine assessed Harris and instructed him to take his medication as ordered.

3

Between August 24 and September 2, 2019, Harris submitted three health service request forms ("HSRFs") and one grievance complaining about the tightness of his prosthesis, which caused him bleeding and sores. In his grievance, Harris complained that Dr. McCarthy had told him on August 13 that he would be cast for a new prosthesis but that nothing had yet happened. In response, on September 5, occupational and physical therapist Jamie Crothers saw Harris, relaying the plan that they would modify Harris' socket at an outside appointment. Crothers also offered to reassess Harris' stump and give him extra socks, but Harris declined both offers. On September 18, Harris submitted another HSRF, again complaining about sores and tightness and asking for a new liner. Nurse James saw Harris on September 20, who reiterated the plan to modify his socket. As Crothers did, James offered to assess Harris' stump, but Harris declined that and her offer of additional socks. On September 23, Crothers sent Harris a note in response to his complaints about pain in the base of his residual limb. Crothers explained again that an orthotist needed to make structural changes to his prosthesis and so needed to wait for such an outside appointment. On September 30, Nurse Jardine saw Harris for a continuing boil on his leg at the socket of his prosthesis and referred him to urgent care for evaluation and a wheelchair. On October 4, Crothers saw Harris for a follow-up. Crothers recommended that Harris stop using his prosthesis in light of his complaints about ongoing boils and skin irritation, and indicated that Harris should use a wheelchair instead. Harris stated that he would use his prosthesis for off-housing unit mobilization, despite Crothers' warning that continuing to wear the prosthesis would mean that the boils and irritation would continue. Crothers gave Harris socks to create additional distal padding and help with his complaints of dropping in his prosthesis.

On October 7, Trammel saw Harris for abscesses and phantom limb pain. Harris reported that he mostly used the wheelchair because his prosthesis did not fit well. On October 8, Nurse Anderson saw Harris, who was wearing his prosthesis. When she reminded him about the plan to use a wheelchair instead, he told Anderson, "I'm not using that, I'm still going to wear it, I know what they said." Doc. 184 ¶ 29. Dr. Biesiada saw Harris on October 31, 2019 for his neurology appointment. Dr. Biesiada increased Harris' gabapentin dosage to 3600 mg per day and ruled out phantom limb pain. On November 5, Harris received a new prosthetic sleeve for his right leg. During a routine appointment later that month, Harris reported that he had his prosthesis adjusted and that he used the prosthesis when off-tier and his wheelchair or a cane while on tier.

On January 7, 2020, Harris saw Dr. McCarthy. Harris complained about leaking fluid from his hydraulic knee unit. Dr. McCarthy told him that she needed administrative approval for a replacement knee unit, indicating that the process would take a while. But she did give Harris a new liner. On January 16, Dr. Haman inspected Harris' stump and again recommended that Harris use his wheelchair. Notes from this visit indicate that "[p]er PT M&R: working on replacement/refurbishing knee unit." Doc. 184 ¶ 33.

On February 18, 2020, Harris submitted a HSRF complaining of back pain. Nurse King saw him on February 20 and prescribed him muscle relaxers. On February 28, Harris again submitted a HSRF for back and knee pain, with Nurse James seeing him on February 29. Nurse James observed that Harris moved well and instructed him to take his medicine. On March 3, Harris again saw Trammel. On March 22, Harris filed a grievance about missing a primary care appointment on March 17, noting that the "appointment was important and urgent as it pertain[ed] to the severity of the damages caused to [his] knee from [his] having to put pressure

on it because of the inadequacy of the prosthesis [he] use[d]." Doc. 184 ¶ 36. The County informed him that it canceled his appointment because of the Covid-19 pandemic, but medical staff nonetheless made sure that he received something for a skin breakdown he had on a wound.

On June 15 and June 21, Harris again filed grievances complaining of sores on his stump and left knee and lower back pain, which he attributed to the misfitting of his prosthesis. On June 23, Dr. McCarthy replaced Harris' hydraulic knee cartridge and adjusted his prosthetic. An x-ray taken on June 25 of Harris' femoral right stump showed significant irregular heterotopic ossification at the stump and small heterotopic ossification within the posterior soft tissue of the mid-thigh. On August 4, 2020, PA Manisha Patel saw Harris for a follow-up for his prosthesis. On August 11, a physical therapist evaluated Harris' orthotic.

On September 7, Harris submitted a grievance because CCDOC staff had taken away ointment he needed for ongoing wound care. The staff member responsible for fielding grievances, Susan Shebel, responded by informing Harris that he had an active prescription for urea cream and could request a refill. On September 12, Nurse Anderson saw Harris, noting that he continued wearing his prosthesis despite his doctors' advice not to wear it. Harris told Anderson, "You want me to look like a cripple, handicapped, I can't be around here like that." Doc. 184 ¶ 42. Harris received gauze and tape for his prosthesis and otherwise declined the prescribed plan of care. On September 13, Harris submitted a HSRF complaining of bad pain and a lack of help. On September 14, PA Kaczrowski saw him, instructed him to use his wheelchair, and referred him to an orthopedic doctor. On September 26 and 27, Harris submitted two separate HSRFs complaining of pain because of his misfitting prosthesis. On October 2, Harris submitted another HSRF indicated he still had sores and health services staff had done nothing to resolve his problems or manage his pain despite his numerous medical request slips.

Nurse Imanlihen saw him on October 3, noting a bump on Harris' right stump but no discharge or bleeding.  She instructed Harris to pad the area and follow his treatment plan.  On October 8, Harris submitted another HSRF complaining about a missed medical appointment on October 5 and requesting further help with pain management.  On October 10, after meeting with Harris about his pain, Nurse Morgan saw Harris standing in the hallway wearing his prosthetic and walking with a steady gait.

On October 15, Harris saw an orthopedist to evaluate his left knee pain, who recommended that Harris go to physical therapy twice a week for six weeks.  On November 24, the orthotic clinic cast Harris for a new prosthetic socket.  On December 10, the Hanger Clinic in Oak Park fitted Harris for his new socket replacement, with Certified Prosthetist Orthotist ("CPO") Tess Ehrhardt-Pinon making minor adjustments.  On December 31, Harris reported to the Hanger Clinic for the socket replacement and liner delivery.

But the next day, on January 1, 2021, Harris submitted a HSRF in which he complained that "when wearing [the prosthesis, his] skin hangs over the lip like a muffin from it being too tightly fitted around [his] knee."  Doc. 184 ¶ 53.  Harris submitted a similar HSRF on February 13.  On March 9, 2021, Harris saw Dr. McCarthy, who acknowledged that his "[i]schial tuberosity appears to be pinching tissue between socket and ishium."  Doc. 184 ¶ 54.  Dr. McCarthy noted that Harris still needed to use a cane.  Harris asked that Dr. McCarthy lower the socket for his prosthesis, and Dr. McCarthy noted that the prosthesis caused "significant trunk lean and poor gait habits," which affected the feel of the prosthesis.  Doc. 184 ¶ 54.  Dr. McCarthy did not lower the socket, but she made other adjustments to the prosthesis that day.

On May 2, 6, and 10, Harris submitted HSRFs requesting an appointment in the amputee clinic for pain and discomfort due to the fit of his prosthesis.  On May 27, Harris submitted a

grievance complaining that he fell and hurt his ankle because he hopped on one leg from the bed to the toilet because he did not have an assistive medical device while his prosthesis was under repair. Shebel responded that Harris had an active order for crutches and a cane. While Harris received crutches on May 19, he preferred to hop than use the crutches. On June 22, Harris presented to the Hanger Clinic for a socket fit assessment, where notes reflect that his "increased discomfort was likely due to volume loss in the residual limb post-socket replacement." Doc. 184 ¶ 57. Harris received a 1/8 Aliplast 10 pad to pad the lateral posterior aspect of the socket.

On September 1, October 29, October 31, November 1, and December 19, 2021, Harris submitted HSRFs requesting medical appointments for pain and discomfort he experienced from the socket's fit. He filed a formal grievance on November 2, disputing Officer Smith's claim that Nurse Santana saw him in response to his HSRF. The grievance officer responded that correctional staff had taken Harris to the dispensary and offered him the opportunity to go to urgent care, but he refused. On October 13, PA Davis saw Harris, who complained that his prosthesis did not fit properly and that he did not think that he had a good device. Harris requested an adjustment to his prosthesis when he saw Davis again on November 24. Davis corresponded with Dr. McCarthy about Harris' complaints, with Dr. McCarthy telling Davis on December 23 that Harris had refused a clinic visit.

On January 25, 2022, Dr. McCarthy and Ehrhardt-Pinon saw Harris at the Stroger clinic for adjustments to his socket. Harris complained he dropped too far into the socket and that the socket was too short, but he refused to wear socks provided to him to help with the issue. Ehrhardt-Pinon and Dr. McCarthy added a pad to his socket. This did not appear to help, however, as Harris continued to complain of pain due to the socket's fit in HSRFs on February 10 and March 1. Harris also submitted an HSRF on April 13 after missing a scheduled

8

appointment the day before.  On April 15, Nurse Davis confirmed that Harris had an appointment in the amputee clinic earlier that week but did not go.

On May 12, CPO Kilpatrick and Ehrhardt-Pinon saw Harris at the Hanger Clinic and observed that he was not wearing his prosthetic socks.  Kilpatrick determined that Harris' liner was worn out, with its gel breaking down from Harris' bone pushing on it.  Kilpatrick adjusted the length of Harris' prosthesis, shaving the inside of the socket and trimming the top of the socket and thigh.  After the adjustment, Harris reported feeling good and he demonstrated a squat with his hips flexed forward, which Kilpatrick noted that most amputees could not do.  On May 24, Ehrhardt-Pinon determined that Harris needed a new liner for his prosthesis because he had a wound/boil that resulted from the liner breakdown.  She also adjusted Harris' prosthesis by cutting down the hard socket, adding a larger pad between the socket and flexible liner, and thinning out the flexible liner for pressure relief.  On July 12, Dr. McCarthy received Harris' new liner.

On September 13, Harris presented to the Hanger Clinic.  At that visit, Ehrhardt-Pinon explained that for an appropriate fit, Harris needed to wear a sock over his liner and instructed Harris to put a sock on when he got back to the jail.  Ehrhardt-Pinon cut down the hard socket of the prosthesis for Harris' comfort and added new Velcro to update the hold of his flexible inner socket to his hard socket.  On March 14, 2023, Ehrhardt-Pinon ordered Harris a new TF seal and prosthetic liner, which Dr. McCarthy and the County Board had approved.  Harris received the new liner on March 28, which Ehrhardt-Pinon cut to the appropriate length.  Dr. McCarthy determined that Harris' prosthesis needed a new knee joint, but the knee unit was out of warranty.  She submitted an authorization form for a similar replacement.  On July 6, Harris

9

presented to the Hanger Clinic for his new hydraulic knee. The CPOs installed the new knee unit and told Harris to wear socks.

CCDOC, and not its medical clinic, controls the schedule for medical appointments and must approve the purchase of medical devices for detainees.[3] According to Jesus Manuel Estrada, the chief operating officer for Cermak, a clinical team determines whether a detainee gets prosthetic medical care and no policies exist denying medical devices based on cost. Dr. McCarthy testified that no one ever told her that the County would not order a new prosthetic device based on cost. She also did not know of any policy for denying a detainee a prosthesis due to cost. In order to obtain a new prosthetic device, Dr. McCarthy had to make recommendations and submit them to a CPO. Dr. McCarthy did not believe that Harris needed a new prosthetic leg, but instead only that he needed a new leg socket. She testified that Harris did not follow the instructions given to him to properly take care of his prosthesis. She also noted that Harris did not want his prosthesis to sit a little higher on the pelvis. Although Dr. McCarthy believed Harris would benefit from wearing socks, Harris did not want to wear them because he felt they pushed him out of his socket.

## II.    Dr. Berry's Opinions

Dr. Dale Berry, the former executive vice president of clinical operations for Hanger Clinic who worked there from 1999 to 2019, is a CPO. According to Dr. Berry, after Harris submitted an HSRF on August 24, 2019, complaining that his prosthesis was tight and causing open sores and bleeding, a CPO should have seen Harris within one to two weeks. Similarly, Dr. Berry opined that medical intervention should occur within days of a patient presenting with an open wound related to prosthetic use, with the patient not wearing the prosthesis at all until the

---

[3] An exception exists for parts included in CCDOC's orthotics contract. Dr. McCarthy testified that she had never seen CCDOC's orthotics contract, however, and the parties have not provided it to the Court.

10

wound heals naturally. He further testified that at the Hanger Clinic, a follow-up, which could be a phone call or text message, occurred within twenty-four to seventy-two hours after adjusting a socket to ensure that no issues arose with the fit. The failure to provide timely care, according to Dr. Berry, exposes a patient to risks such as infection, the need for revision, surgery, or amputation. Dr. Berry opines that Harris' follow-up interactions with medical staff after prosthetic adjustments did not meet clinical standards of care. He also opines that Harris' untimely access to prosthetic services and care did not meet the standard of care, observing that it took Harris sixty-eight days to see a physician after making specific requests for immediate care and 136-days to receive prosthetic treatment. Dr. Berry notes the 168-day delay between Dr. McCarthy identifying Harris' leaking hydraulic knee and replacing it, despite clinical standards of care requiring the immediate replacement or repair of damaged components. Dr. Berry recalled every Hanger Clinic facility having at least two or three hydraulic cylinders in stock, meaning that a swap of a hydraulic knee should only have taken several minutes. The delay in replacing the hydraulic knee, according to Dr. Berry, exposed Harris to a risk of a fall, caused Harris to walk with gait deviations and increased energy consumption, socket discomfort, and pain. Dr. Berry testified that a patient with a prosthesis that does not fit them properly could fall down a set of stairs and die. According to Dr. Berry, Harris' lack of access to prosthetic services contributed to a decline in Harris' mobility, comfort, stability, and quality of life.

Although not a medical doctor or wound care specialist, Dr. Berry considers Dr. McCarthy's medical decisions and recommendations to be consistent with clinical standards of care, as she identified if something was leaking or broken and needed to be fixed or replaced. Dr. Berry opines that an unreasonable delay in prosthetic care occurs when a nurse, general practitioner, or physical therapist sees a patient for prosthetic needs instead of a CPO. Dr. Berry

11

found that once Harris saw a CPO, the CPO addressed Harris' issues professionally, quickly, and to Harris' satisfaction.

### III.     Other CCDOC Detainee Amputees

CCDOC has approximately five to ten detainees with prosthetic devices out of about 4,700 to 4,800 detainees at any given time. According to Nurse Soumya James, she had no knowledge of the County refusing to order a new prosthetic device for a detainee due to cost. Nor did she know of any County policy that would prevent a detainee from getting a new prosthetic device due to cost. Cook County Health Policy F-01.1 provides that Cermak follows "national clinical practice guidelines," in other words, those guidelines "promulgated by national professional organizations and accepted by experts in the respective medical field," for patients with chronic diseases and other special needs, which includes amputees. Doc. 184 ¶ 118.

Derek Thompson, a double amputee, was in CCDOC custody from November 2019 through April 2020. He had problems with the lock mechanism on his right prosthetic device and had improperly fitting prosthetic legs. He did not need a new prosthesis, however. He never spoke with anyone about budget or a CCDOC policy of not paying for his device. Both of Thompson's residual limbs bled from two bones that protruded through his skin, an issue he did not have before arriving at CCDOC. Despite submitting five HSRFs and three formal grievances from December 2019 through March 2020 requesting to see a prosthetics and wound specialist, Thompson never saw a CPO, nor was he taken to an outside facility for treatment. Instead, the doctor treating him for his wounds simply indicated that the wound would heal and gave him some ointment and gauze. After Thompson's release from CCDOC in April 2020, it took him approximately nine to ten months to see a doctor regarding his leg.

12

Tremann Treadwell, a right leg above-the-knee amputee, was detained at CCDOC from February to March 2019 and January to November 2020. He had trouble with his prosthesis when housed in Pinckneyville in 2019 before coming to CCDOC. While at Pinckneyville, he was fitted for a new prosthesis, but he did not receive it before he moved to CCDOC. He believed he only needed a new socket, not an entirely new leg. Treadwell submitted five HSRFs in 2020 for severe back and nerve pain caused by his prosthesis. Despite documenting his complaints and receiving a referral from Dr. Manisha Patel to the orthotics department, Treadwell never saw a CPO while in CCDOC custody.

Isiah Mitchell, a left leg amputee, was detained at CCDOC from 2017 to 2019. While at CCDOC, the foot shell of his prosthesis began to crack, he needed additional stump socks, and his socket did not fit properly. Mitchell did not mention the crack in the foot shell to Dr. McCarthy, and Dr. McCarthy never told Mitchell the cost of a new socket. Mitchell had his prosthesis adjusted at the University of Chicago Hospital, and he also received sleeves and stump socks. He did not request a new prosthesis. In June 2017, Dr. McCarthy noted that Mitchell had volume loss in his stump and presented with bottom walking. She also noted that he needed a new liner with pin, a tightened socket, a new external suspension sleeve, a nylon protective cover, and stump socks, and that she also may need to hang pre-tibial pads in the socket. On October 16, 2017, Mitchell submitted a HSRF about his prosthesis causing severe back pain and nerve damage. In April 2019, Dr. McCarthy noted the same pin and liner issue she had observed in June 2017. Mitchell was measured for a liner and pin on June 11, 2019. On August 27, 2019, Mitchell submitted a HSRF complaining that he never had a follow-up appointment. On September 20, 2019, Dr. Ennis saw Mitchell, who complained that his prosthesis was in such bad condition that he was advised not to use it at all. Mitchell stated he never received replacement

13

prosthetic parts at CCDOC and had significant pain, including back and hip pain, open sores, bleeding, and pus, while at CCDOC. After he was transferred to the Illinois Department of Corrections in November 2019, he waited about three months for a new socket.

Berl McKinnie, a right leg amputee, was detained at CCDOC from 2014 to 2021. Because he lost significant weight, his prosthesis no longer fit, causing him pain. He had a wheelchair to use, but that limited his daily activities. He had pain in his amputated leg and skin damage on his residual limb. He saw doctors at Cermak daily, who referred him to Dr. McCarthy. Dr. McCarthy recommended he obtain a new prosthesis because his current prosthesis was too big. On February 7, 2017, McKinnie saw Dr. McCarthy, who noted McKinnie had a broken prosthetic foot, his liner was breaking down, and his lock did not catch correctly. Dr. McCarthy placed an order for replacement parts. From April 25 to June 4, 2017, McKinnie filed four grievances asking to see a CPO. In December 2017, he received a new locking liner with pin. In February 2018, Dr. McCarthy noted that McKinnie's liner was in good condition, the fit looked good, McKinnie walked well, and McKinnie wore appropriate socks. Dr. McCarthy padded McKinnie's leg and adjusted the prosthesis for it to fit tighter. Dr. McCarthy told McKinnie that while she could request a new prosthesis, the County had to approve it and provide the money for it, and she could not do anything until the County approved the request. She never told McKinnie how much a new prosthetic leg cost. McKinnie never received a new prosthetic leg during his time at CCDOC.

Jonathon Owens, an amputee detained at CCDOC from 2019 to 2023, complained of an ill-fitting prosthetic leg that needed a new liner, sleeve, and air valve. He submitted a grievance regarding his prosthesis and waited up to six weeks for a medical provider to see him. Dr. McCarthy told him she could adjust his prosthesis but would have to order supplies. Owens also

14

testified that Dr. McCarthy told him that she would try to get him a new prosthesis, but that it was hard to get the County to pay. Although Owens did not receive a new prosthetic leg, he did get ointments, antibiotics, sleeves, and socks, and he also had adjustments made to his prosthesis.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

15

## ANALYSIS

Harris claims that Defendants did not provide him with appropriate medical care for his prosthesis. As a post-trial detainee, the Eighth Amendment's deliberate indifference standard applies to Harris' claim. Healthcare providers violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both objective and subjective elements: (1) the inmate must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and disregard a substantial risk of harm to the inmate's health. *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020); *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016).

Harris cannot hold Defendants liable for a constitutional violation under § 1983 pursuant to the doctrine of *respondeat superior*. *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). Defendants may be held liable, however, when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *First Midwest Bank ex rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (a municipality "may be held liable for its own violations of the federal Constitution and laws"). To prove a *Monell* claim, Harris must demonstrate: "(1) [he] was deprived of a constitutional right; (2) the deprivation can be traced 'to some municipal action (i.e., a policy or custom), such that the challenged conduct is properly attributable to the municipality itself'; (3) 'the policy or custom demonstrates municipal fault, i.e., deliberate indifference'; and (4) 'the municipal action was the moving force behind the federal-rights violation.'" *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023).

16

Harris can demonstrate municipal action in three ways: "(1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law;" or (3) a constitutional injury caused by a person with final policymaking authority. *Est. of Moreland v. Dieter*, 395 F.3d 747, 758–59 (7th Cir. 2005); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). With respect to the fault element, a plaintiff must prove that the municipality's action "was taken with 'deliberate indifference'" to the plaintiff's constitutional rights and that the municipality's action was the "moving force" behind the violation of the plaintiff's constitutional rights. *LaPorta*, 988 F.3d at 987 (citations omitted). Negligence or gross negligence is not enough, rather it must have been "obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* Further, a "direct causal link" must exist between the challenged municipal action and the violation of the plaintiff's constitutional rights. *Id.*

Defendants argue that Harris cannot establish any of the elements of his claim. The Court need only address the municipal action prong, however, and so assumes for purposes of this motion that he could establish an underlying constitutional violation. As for municipal action, Defendants argue that Harris cannot establish that a County policy or practice caused him to receive any allegedly delayed or inadequate care.[4] They maintain that, at most, Harris can point only to his own experience, which reflects isolated disputes over his care, not a policy of

---

[4] At the pleading stage, Harris appeared to base his *Monell* claim on the County maintaining a policy or practice of denying and delaying medical care to detainees based on cost-cutting measures. *See* Doc. 89 at 6. Although the parties include some references to concerns about cost in the parties' joint statement of facts and briefs, Harris does not argue that he can prove his claim based on the County having a policy or practice of denying or delaying care based on cost, and so the Court understands Harris to have abandoned this theory and does not address it further.

delay or denial of treatment. "[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (citation omitted) (internal quotation marks omitted)); *see also Rossi*, 790 F.3d at 737 (a *Monell* claim requires "a *widespread practice* that permeates a critical mass of an institutional body," not "individual misconduct"). Harris argues, however, that he can establish a widespread practice not only because he failed to receive timely medical treatment on at least thirty occasions over a period of three years because of his ill-fitting and broken prosthetic, but also because five other detainees had similar experiences.

Initially, Harris' own experiences do not create a question of fact as to the existence of a widespread practice of delayed care. While Harris claims to have identified thirty incidents of delayed treatment, he only identifies the following alleged instances of delay in his response brief: (1) a sixty-eight day delay in seeing a doctor and a seventy-three day delay in seeing a CPO after Harris submitted a HSRF on August 24, 2019 complaining that his prosthesis was too tight; (2) a 168-day delay in replacing his hydraulic knee unit in 2020; (3) a fifty-one day delay for a prosthetic adjustment after he made three HSRF requests beginning on May 2, 2021; and (4) an eighty-four day delay in seeing a CPO after submitting various HSRFs and a grievance beginning on September 1, 2021, in which he sought an adjustment of his prosthesis.[5] The Court only considers these four instances, given that "it is not the court's job to scour the record in search of evidence to defeat a motion for summary judgment." *Hildreth v. Butler*, 960 F.3d 420, 429–30 (7th Cir. 2020) (citation omitted) (internal quotation marks omitted).

---

[5] Harris also generally states that he did not receive follow-up appointments to confirm the fit of his prosthesis. But the record shows that after he received a new prosthetic sleeve on November 5, 2019, he saw a CPO on November 21, 2019 for adjustments, and that after he had his hydraulic knee cartridge replaced on June 23, 2020, the CPO adjusted the socket on June 25, 2020.

18

Considering these four instances, the Court first notes that Harris ignores many intermediate steps and selectively chooses how to define appropriate medical care in describing the alleged instances of delay. For example, between August 24, 2019, when Harris submitted an HSRF complaining his prosthesis was too tight, and October 31, 2019, when Harris saw a neurologist, Harris saw a nurse several times, a physical and occupational therapist twice, and a PA, who all addressed his complaints about his prosthesis. The fact that Harris did not agree with the medical professionals' plan of action, however, does not amount to deliberate indifference. *See Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021) ("Johnson's ultimate disagreement with defendants' course of treatment provides no basis to support defendants' deliberate indifference."); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmate not entitled to "demand specific care" or to "the best care possible"). Similarly, between submitting an HSRF on September 1, 2021 and seeing a CPO on January 25, 2022, Harris saw a nurse and a PA several times and his medical records also reflect that he refused several clinic visits. But even viewing the facts as Harris does, four instances of delay over a three-year period involving only Harris "fail to qualify as a widespread unconstitutional practice so well-settled that it constitutes a custom or usage with the force of law." *Hildreth*, 960 F.3d at 427–28 & n.6 (collecting cases); *see also Grieveson*, 538 F.3d at 774–75 (four instances over a period of eleven months that the plaintiff alone experienced were "not enough to foster a genuine issue of material fact that the practice was widespread").

But Harris also argues that at least a question of fact exists because other amputees detained at CCDOC experienced similar issues of delayed or denied care. Although Harris has presented medical records and testimony from five other amputees, their experiences all differ. For example, Treadwell came to CCDOC already awaiting a new prosthetic device that a

19

different facility had ordered for him. Mitchell testified that he did not reveal some of the problems he had with his prosthesis, making it impossible for the County's medical staff to address his undisclosed issues. And he also admitted to receiving adjustments to his prosthesis and being measured for replacement prosthetic parts.[6] McKinnie testified that at least for some period of time, he saw doctors at Cermak on a daily basis to address issues with his prosthesis, with those doctors referring him to Dr. McCarthy for further evaluation. Owens testified that Dr. McCarthy recognized issues with his prosthesis and indicated she would make adjustments when she received the needed supplies. He also acknowledged receiving ointments, socks, and sleeves to address issues with the fit of his prosthesis. And Thompson testified that, after his release from CCDOC, it took him nine to ten months to see a doctor about his prosthesis.

The Court acknowledges that the other amputees' experiences need not be perfectly similar, but Harris has not done enough to allow a jury to determine whether any "similarities show a widespread practice that supports a finding of an unconstitutional custom or practice." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021). He has failed to set forth a coherent theory of how these other amputees' experiences, when combined with his, suggests a widespread practice of deliberate indifference. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."); *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material. Judges are not like pigs, hunting for truffles buried in the record." (citation omitted) (internal quotation marks omitted)). Dr. Berry, Harris' expert, did not opine on how

---

[6] Mitchell did not receive the replacement parts before his transfer to another facility.

20

these other amputees' experiences compared to Harris' or the import of any specific alleged delays that they experienced. And, as with Harris, many of the other amputees' complaints about their care only amount to disagreements with the County's response to their medical issues, which cannot support a deliberate indifference claim. *Johnson*, 5 F.4th at 826; *Arnett*, 658 F.3d at 754. Therefore, because of the individualized experiences of each of the amputees and the lack of evidence of systemic deficiencies, Harris has not marshaled sufficient evidence to create a question of fact on his *Monell* claim. *See Bridges v. Dart*, 950 F.3d 476, 480–81 (7th Cir. 2020) ("But more than five million people reside in Cook County, and the Department houses thousands of detainees, with hundreds entering and leaving on a daily basis. In this context, three or five incidents over a seven-year period is inadequate as a matter of law to demonstrate a widespread custom or practice.").

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [181]. The Court enters judgment for Defendants on Harris' claims against them in the third amended complaint and terminates this case.

Dated: June 24, 2026

_____
SARA L. ELLIS
United States District Judge

21